IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MAURICE C. CAMPBELL,

        Plaintiff,                 No. CIV S-07-1419 WBS GGH P

    vs.

CALIFORNIA DEPARTMENT OF
CORRECTIONS AND
REHABILITATION, et al.,

        Defendants.             FINDINGS AND RECOMMENDATIONS

_____/

Introduction

        Plaintiff, a state prisoner proceeding pro se, seeks relief pursuant to 42 U.S.C. § 1983.  Pending before the court is defendants' motion for summary judgment, filed on November 9, 2009, to which plaintiff filed his opposition on January 29, 2010,[1] after which defendants filed a reply on February 5, 2010.

Background & Summary of Allegations

        Plaintiff, in a case originally assigned as No. CIV S-07-1419 MCE KJM, filed a complaint wherein he sought to proceed on the complaint as a class action; however, the

_____

[1] Plaintiff was granted an extension of time to file his opposition to the summary judgment motion, by order filed on January 19, 2010.

1

1  complaint was construed as an individual action.  See Order, filed on January 10, 2008.  Instead,

2  plaintiff was permitted to proceed only with respect to himself and only on his Eighth

3  Amendment claims against the following five defendants: Haythorne, Hague, Rodriguez, Rueller

4  (spelling later corrected to Ruller) and Arnt (spelling subsequently corrected to "Arndt").  See id.

5  This case and another, Williams v. Walker, CIV S-07-2385 FCD CMK P, were both later related

6  by the undersigned to an earlier case assigned to the undersigned and to Judge William B. Shubb:

7  Jackson v. Walker, CIV S-06-2023 WBS GGH P, and all three have since been proceeding

8  before Senior District Judge Shubb and the undersigned.  See Order, filed on June 6, 2008.

9          The gravamen of the instant case (as well as to the two related cases) concerns

10  alleged unsanitary food preparation, food service and food handling conditions at California State

11  Prison-Sacramento (CSPS).  Plaintiff Campbell alleges that he arrived at CSPS on October 27,

12  2005,[2] where rodents infest the main kitchen and food has been contaminated with rat/rodent

13  feces and bite marks and dozens of inmates have complained of CSPS' correctional officials'

14  failure to adhere to health and safety standards with regard to food service and handling,

15  including service of food from improperly cleaned bread racks.  See Complaint, filed on July 18,

16  2007.  Plaintiff claims, in his verified complaint, that on May 23, 2006, he was diagnosed and

17  treated for food poisoning as a result of an evening meal served at the prison.  Id., at 10, 21-22.

18  Plaintiff alleges deliberate indifference by defendants to the unsanitary food service and

19  conditions of which they are aware in violation of his plaintiff's Eighth Amendment rights.

20  Plaintiff seeks injunctive and declaratory relief, and money damages, including punitive

21  damages.  Id., at 20-21.

22          As to specific defendants within the verified complaint, plaintiff's claims are

23

24          [2] Actually, within the verified complaint, plaintiff alleged that he had arrived at CSPS on
    October 27, 2006.  Complaint, p. 6.  Of course, this must be inaccurate since plaintiff alleges he
25  was treated at CSPS for food poisoning, before that, in May of 2006.  Id., at 10.  In his deposition
    testimony, plaintiff confirms that he actually arrived CSPS in October of 2005.  Plaintiff's
26  Deposition, 7:24 - 8:5.

somewhat generic.  That is, as to all defendants, plaintiff alleges that each ignored and denied

that existence of rats or rodents in the main kitchen for years, resulting in an infestation of

rats/rodents in the area where food is stored, prepared and served in the main kitchen.  Id., at 14.

Plaintiff alleges that each defendant has subjected plaintiff and other inmates to unsanitary food

service due to the implementation of an enforced cell-feeding policy, violating Health and Safety

Code §§ 27605, 27623, 28291, and 28295 through 28296.  Id., at 19.  Plaintiff further alleges that

each defendant has been deliberately indifferent: in refusing to exterminate the rats/rodents from

the main kitchen from the first notice and in withholding information about the existence of

rats/rodents from inmates and from mandatory annual health inspections; in allowing the

breeding and mating of rats/rodents in the main kitchen for years; in obstructing, ignoring and

denying inmate grievances regarding correctional officials' defiance of proper food handling and

service procedures; in failing to implement an adequate self-evaluation plan with respect to food

service; and in failing to take appropriate steps to remedy the cruel and unusual punishment

thereby inflicted upon plaintiff and others similarly situated.  Id.  Among the exhibits he includes

with his verified complaint (noted below), plaintiff attaches Exhs. I, J, K, L, M, N, evidently all

copies of documents described as responses to the matters at issue in this complaint that were

directed not to this plaintiff, but to Inmate Williams, from, respectively, the American Civil

Liberties Union, the Foreman of the 2005-2006 Sacramento County Grand Jury, Senator Dianne

Feinstein, the California Health and Human Services Agency, the Officer of the Inspector

General, the CDCR Office of Risk Management.  Id., at 56-69.

Injunctive Relief Moot

        At the outset, the court notes that plaintiff filed a notice of change of address on

June 7, 2010 to Corcoran State Prison.  When an inmate seeks injunctive relief concerning an

institution at which he is no longer incarcerated, his claims for such relief become moot.  See

Sample v. Borg, 870 F.2d 563 (9th Cir. 1989); Darring v. Kincheloe, 783 F.2d 874, 876 (9th Cir.

1986).  See also Reimers v. Oregon, 863 F.2d 630, 632 (9th Cir. 1988).  Plaintiff has not

1  demonstrated any reasonable possibility that he will be incarcerated at California State Prison-

2  Sacramento at any predictable time in the future.  Therefore, the court will recommend that any

3  claims for injunctive relief be dismissed.

4  Motion for Summary Judgment

5         Defendants move for summary judgment contending that (1) the conditions about

6  which plaintiff complains were not sufficiently serious to amount to a constitutional deprivation

7  [i.e., an Eighth Amendment violation]; (2) even if the conditions complained of were objectively

8  serious, defendants did not ignore any claimed violations, but instead took corrective measures to

9  address any lapses in CSPS food service; (3) there is no medical evidence that plaintiff

10  contracted food poisoning or suffered any harm as a result of eating food at CSPS; and (4)

11  defendants are entitled to qualified immunity because there was no constitutional violation and

12  defendants acted reasonably in addressing inmate complaints about food service at CSPS.

13  Motion for Summary Judgment (MSJ), Docket # 35-1, pp. 1-2.

14         *Summary Judgment Standards under Rule 56*

15         Summary judgment is appropriate when it is demonstrated that there exists "no

16  genuine issue as to any material fact and that the movant is entitled to judgment as a matter of

17  law." Fed. R. Civ. P. 56(c).

18         Under summary judgment practice, the moving party

19         always bears the initial responsibility of informing the district court
   of the basis for its motion, and identifying those portions of "the

20         pleadings, depositions, answers to interrogatories, and admissions
   on file, together with the affidavits, if any," which it believes

21         demonstrate the absence of a genuine issue of material fact.

22  Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (quoting Fed. R. Civ.

23  P. 56(c)).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive

24  issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings,

25  depositions, answers to interrogatories, and admissions on file.'" Id.  Indeed, summary judgment

26  should be entered, after adequate time for discovery and upon motion, against a party who fails to

4

1   make a showing sufficient to establish the existence of an element essential to that party's case,

2   and on which that party will bear the burden of proof at trial.  See id. at 322, 106 S. Ct. at 2552.

3   "[A] complete failure of proof concerning an essential element of the nonmoving party's case

4   necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary judgment

5   should be granted, "so long as whatever is before the district court demonstrates that the standard

6   for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323, 106 S. Ct. at

7   2553.

8            If the moving party meets its initial responsibility, the burden then shifts to the

9   opposing party to establish that a genuine issue as to any material fact actually does exist.  See

10  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356

11  (1986).  In attempting to establish the existence of this factual dispute, the opposing party may

12  not rely upon the allegations or denials of its pleadings but is required to tender evidence of

13  specific facts in the form of affidavits, and/or admissible discovery material, in support of its

14  contention that the dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11,

15  106 S. Ct. at 1356 n. 11.  The opposing party must demonstrate that the fact in contention is

16  material, i.e., a fact that might affect the outcome of the suit under the governing law, see

17  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); T.W. Elec.

18  Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the

19  dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the

20  nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

21           In the endeavor to establish the existence of a factual dispute, the opposing party

22  need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

23  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

24  versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

25  judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

26  genuine need for trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P.

5

56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (citation omitted).

On March 20, 2008, the court advised plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v. Eikenberry, 849 F.2d 409, 411-12 (9th Cir. 1988).   The above advice would, however, seem to be unnecessary as the Ninth Circuit has held that procedural requirements applied to ordinary litigants at summary judgment do not apply to prisoner pro se litigants.  In Thomas v. Ponder, __F.3d__, No. 09-15522, 2010 WL 2794394 (9th Cir. July 16, 2010), the district courts were cautioned to "construe liberally motion papers and pleadings filed by *pro se* inmates and ... avoid applying summary judgment rules strictly."  Id. at 10297, *5.  No example or further definition of "liberal" construction or "too strict" application of rules was given in Ponder suggesting that any jurist would know inherently when to dispense with the wording of rules.  Since the application of any rule which results in adverse consequences to the pro se inmate could always be construed in hindsight as not liberal enough a construction, or too strict an application, it appears that only the essentials of summary judgment,

1  i.e., declarations or testimony under oath, and presentation of evidence not grossly at odds with

2  rules of evidence, apply to the pro se plaintiff.

3  *Undisputed Facts*

4  After reviewing defendants' undisputed facts (DUF) and plaintiff's response, the

5  court finds the following to be undisputed, either expressly undisputed by plaintiff or expressly

6  not refuted due to an alleged lack of knowledge, evidence or information.  If any part is disputed

7  (even though plaintiff fails to cite the supporting evidence for his position), that portion of the

8  fact that the court finds not to be in dispute is noted.  Relevant facts, disputed or undisputed,

9  pertaining to the individual defendants are set forth under the individual defendant's name.

10  DUF # 1: Plaintiff Maurice Campbell arrived at California State Prison

11  Sacramento (SAC) [CSPS][3] in October 2005.  DUF # 2: Plaintiff alleged that the main kitchen at

12  CSPS was infested with rodents and that food contaminated by rodents was fed to the inmate

13  population.  As to DUF # 3 and DUF # 4, the court finds that it is true that plaintiff did not work

14  in the CSPS main kitchen during the period relevant to this lawsuit and therefore did not have

15  personal knowledge as to the allegations that he makes with regard to the main kitchen at that

16  time.  Plaintiff does not deny that he did not work at the main kitchen at that time, but seeks to

17  rely on the experience of plaintiffs in the related cases, noted above, for information supporting

18  his allegations.  Plaintiff's resp. to DUF, pp. 1-2.  Plaintiff asserts that he now works in the CSPS

19  main kitchen production department and thus has first-hand knowledge of on-going but

20  unspecified violations (no supporting evidence is cited in his response).[4]  DUF # 5: During the

21  winter of 2005 to 2006, rodents were coming into the main kitchen and other buildings

22  throughout the prison because of the heavy rain fall.  In response, plaintiff does not dispute the

23  fact as stated but asserts, without identifying supporting evidence, that rodents were not limited

24  _____

    [3] The court will use the abbreviation CSPS for California State Prison-Sacramento.

25

26      [4] At the time this opposition was filed on January 29, 2010, it may be that plaintiff was working in the CSPS main kitchen, but he has apparently since been transferred, as noted above.

to entering the prison buildings in the winter.  Plaintiff's response to DUF, Docket # 43, p. 5.

DUF # 6: Vector control at CSPS took corrective measures by laying down traps, which plaintiff

acknowledges while implying that other unspecified measures could have been taken.  Plaintiff's

resp. to DUF, p. 2.   DUF # 7: Defendant Haythorne, defendant Hague, vector control, and the

supervisor of building trades held meetings to discuss and monitor the rodent situation.  DUF #

10: CSPS has a policy of discarding an entire food item that is suspected of being contaminated,

whether by rodents or spoilage.  This means that if a large sack of flour or sugar appears to have

been gnawed by rodents, the entire sack is tossed out.  DUF # 11: The presence of rodents or

other vermin is common in any location where food is located or prepared. DUF # 12: The

California Retail Food Code (CRFC) sets forth the standards for sanitation in the food industry,

and CRFC training dedicates an entire section on vector control and acknowledges that the

presence of rodents and other vermin occurs in kitchens and other settings where food is prepared

and stored.  CRFC focuses on controlling the vermin problem and ensuring that contaminated

food is not served.  DUF # 20: [Plaintiff] Campbell alleged that the food service in the satellite

kitchens at CSPS was unsanitary because the racks used to carry the food trays were dirty and

stacked, non-medically cleared inmates were handling food, a dirty rolling cart was used during

food service, and inmates and correctional staff did not wear gloves or protective head gear.  In

his response, plaintiff asserts that only as of 2007, did corrective measures regarding the satellite

kitchens begin to be implemented.  Plaintiff's resp. to DUF, p. 3.   DUF # 21:  Although plaintiff

never worked in the satellite kitchens at SAC, between 2005 and 2006, [plaintiff] volunteered

about eight to ten times to carry racks with food trays during the feeding process.  DUF # 25:

Defendants, except [defendant] Arndt, inspected the various satellite kitchens on occasion.

During those inspections in 2005 and 2006, they did not see inmate workers without the proper

protective attire, such as gloves and hair nets.  They did not see the stacking of food trays or

bread racks.  They did not see the use of dirty carts or bread racks.  And they did not see bread

\\\\\

racks thrown on the floor.[5]  DUF # 35: Plaintiff alleged that on or about May 23, 2006, he was

diagnosed with food poisoning at CSPS; he suffered no other injury.  DUF # 37:  Dr. Duc did not

diagnose [plaintiff] with food poisoning, and he never told [plaintiff] that he had food poisoning.

DUF: # 38:  Dr. Duc suspected that [plaintiff] had an infection of Campylobacter, a common

bacterial infection that causes diarrhea, which was spread by an inmate who had recently

transferred to CSPS from another prison.  DUF # 40: [Plaintiff] Campbell never asked Dr. Duc

what Campylobacter meant or what caused his gastroenteritis.  DUF # 41: In the second level

response to [plaintiff's] inmate grievance, he was informed that there was a bacterial outbreak at

the prison, but that the source of the outbreak was not determined.  DUF # 42: [Plaintiff],

however, was told by the investigating officer assigned to respond to his grievance, that an

inmate transferred to CSPS from another prison had an illness that spread throughout the yard.

DUF # 43: [Plaintiff] did not ask, and no medical staff ever told him, that his symptoms of

diarrhea in May 2006 were caused by eating food that was contaminated by: rodents; the stacking

of carrying racks; the use of dirty carrying racks or rolling cart; or non-medically cleared porters.

DUF # 45:[Plaintiff] did not suffer any long-term injury as a result of his alleged food poisoning.

Plaintiff does not dispute this but avers that he did endure "four days of agonizing pain" due to

food poisoning.  Plaintiff's resp. to DUF, p. 5.  DUF # 46: No correctional, food services, or

medical staff ever told defendants that an inmate got food poisoning, or that there was a food

poisoning outbreak, at CSPS in 2006.  Plaintiff does not dispute this but alleges that defendants

were engaged in a cover-up of a food poisoning outbreak (again, identifying no supporting

evidence).  Plaintiff's resp. to, p. 5.

### Eighth Amendment Legal Standard

"'Because routine discomfort is part of the penalty that criminal offenders pay for

---

[5] Although not adequately disputed at the appropriate place, the court finds there is some question raised as to whether this representation can be deemed undisputed with regard to defendant Hague.  See below.

1   their offenses against society, only those deprivations denying the minimal civilized measure of

2   life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation.'"

3   Somers v. Thurman, 109 F.3d 614, 623 (1997), quoting Hudson v. McMillian, 503 U.S. 1, 9, 112

4   S.Ct. 995, 1000 (1992) (omitting internal quotations and citations).

5           [A] prison official cannot be found liable under the Eighth
        Amendment for denying an inmate humane conditions of
6       confinement unless the official knows of and disregards an
        excessive risk to inmate health or safety; the official must both be
7       aware of facts from which the inference could be drawn that a
        substantial risk of serious harm exists, and he must also draw the
8       inference.

9   Farmer v. Brennan, 511 U.S. 825, 837, 114 S. Ct. 1970 (1994).

10          However, "[p]rison officials have a duty to ensure that prisoners are provided

11  adequate shelter, food, clothing, sanitation, medical care, and personal safety." Johnson v.

12  Lewis, 217 F.3d 726, 731 (9th Cir. 2000), citing, inter alia, Farmer v. Brennan, 511 U.S. at 832,

13  114 S. Ct. 1970; Hoptowit v. Ray, 682 F.2d 1237, 1246 (9th Cir.1982) ("[A]n institution's

14  obligation under the eighth amendment is at an end if it furnishes sentenced prisoners with

15  adequate food, clothing, shelter, sanitation, medical care, and personal safety" [internal

16  quotations omitted]). When an inmate has been deprived of necessities, "the circumstances,

17  nature and duration of a deprivation...must be considered in determining whether a constitutional

18  violation has occurred." Johnson, supra, at 731.  "The occasional presence of a rodent is

19  insufficient to establish the objective component of an Eighth Amendment claim, which requires

20  that a deprivation be sufficiently serious," Tucker v. Rose, 955 F. Supp. 810, 816 (N.D. Ohio

21  1997); however, "'a lack of sanitation that is severe or prolonged can constitute an infliction of

22  pain within the meaning of the Eighth Amendment.'"  Johnson, supra, at 731, quoting Anderson

23  v. County of Kern, 45 F.3d 1310, 1314, as amended, 75 F.3d 448 (9th Cir. 1995).   In Somers,

24  supra, the Ninth Circuit cited a Seventh Circuit case, French v. Owens, 777 F.2d 1250, 1255 (7th

25  Cir. 1985), wherein it was observed that the Tenth Circuit, in Ramos v. Lamm, 639 F.2d 559,

26  570-71 (10th Cir. 1980), has noted that the state is obligated to provide "'nutritionally adequate

10

food that is prepared and served under conditions which do not present an immediate danger to

the health and well being of the inmates who consume it,'" and determined that "the state health

code, while not establishing 'constitutional minima,' is relevant in making a finding regarding

the constitutionality of existing conditions."

> Inmate workers are not given basic instruction on food protection
> and food service sanitation.[ ] Consequently food items are stored
> on the floors of walk-in storage compartments and food is often
> left uncovered allowing the rodents and roaches to contaminate it.
> Food products which can support food borne diseases are not
> properly stored and are often left out at room temperature. Food
> preparation surfaces and cooking equipment are not properly
> cleaned and therefore provide areas for significant bacterial
> growth.  Food, when it is being served to inmates, is kept at
> substandard temperatures due to the improper use of the available
> equipment.

Ramos, supra, at 571.

In that case, the Tenth Circuit court noted that the Colorado Department of Health

had found the prison's food service substantially deficient and that the record "amply" supported

"the district court's findings and conclusions that the conditions in the food service areas ... are

unsanitary and have a substantial and immediate detrimental impact upon the health of the

inmate population."  Id., at 571-72.

> *Some* conditions of confinement may establish an Eighth
> Amendment violation "in combination" when each would not do
> so alone, but only when they have a mutually enforcing effect that
> produces the deprivation of a single, identifiable human need such
> as food....

Wilson v. Seiter, 501 U.S. 294, 304, 111 S. Ct. 2321, 2327 (1991)[emphasis in original].

> [I]n order to prevail and recover damages against any of the named
> prison officials, the inmate[] in this case must prove (1) that the
> specific prison official, in acting or failing to act, was deliberately
> indifferent to the mandates of the eighth amendment and (2) that
> this indifference was the actual and proximate cause of the
> deprivation of the inmate['s] eighth amendment right to be free
> from cruel and unusual punishment.

Leer v. Murphy, 844 F.2d 628, 634 (9th Cir. 1988).

Plaintiff cites, inter alia, Hoptowit v. Spellman, 753 F.2d 779, 783 (9th Cir. 1985),

11

1  for the finding that vermin infestation was "a condition inconsistent with the adequate sanitation

2  required by the Eighth Amendment."  Opposition (Opp.), Docket # 44, p. 12.  In that case,

3  however, the infestation was also evaluated in light of other sanitation hazards, "such as standing

4  water, flooded toilets and sinks, and dank air" such that it constituted "an unnecessary and

5  wanton infliction of pain proscribed by the Eighth Amendment."

6          Defendants note LeMaire v. Maass, 12 F.3d 1444, 1456 (9th Cir. 1993).  MSJ,

7  Doc. # 35-1, p. 7.  In LeMaire, supra, the Ninth Circuit observed that Eighth Amendment

8  requisites are met when "prisoners receive food that is adequate to maintain health; it need not be

9  tasty or aesthetically pleasing."   "'The fact that the food occasionally contains foreign objects or

10  sometimes is served cold, while unpleasant, does not amount to a constitutional deprivation.'"

11  Id., quoting Hamm v. DeKalb County, 774 F.2d 1567, 1575 (11th Cir. 1985).   In Islam v.

12  Jackson, 782 F. Supp. 1111, 1113-1115 (E.D. Va. 1992), also cited by defendants (MSJ, Doc. #

13  35-1, p. 7), the court found that one instance of being served contaminated food and thirteen days

14  of being served food under unsanitary conditions were not sufficiently serious to rise to the level

15  of an Eighth Amendment violation.  In Grubbs v. Bradley, 552 F. Supp 1052, 1128 (D.C. Tenn.

16  1982), the district court found the lack of sanitation in certain prison kitchen and food areas

17  "appalling," observing that "inmates forced to eat the food prepared and served under those

18  conditions face a constant risk of contracting any number of food-borne diseases."  In Grubbs,

19  supra, however, the court did not hold that therein the presence of vermin alone amounted to an

20  Eighth Amendment violation and the court there found multiple unsanitary conditions.

21          Defendants cite a Fifth Circuit case wherein a single mass food poisoning

22  incident, without serious or permanent injury, does not state a constitutional deprivation.  MSJ,

23  Doc. # 35-1, p. 8, citing George v. King, 837 F.2d 702, 705-706 (5th Cir. 1988).  To which

24  plaintiff might counter that, as he is alleging "constant complaints" by inmates (Opp., p. 10),

25  these constitute frequent instances of violations of health and safety standards for which prison

26  officials failed to provide remedial measures.  Plaintiff relies on Curry v. Scott, 249 F.3d 493,

12

1  508 (6th Cir. 2001), for the proposition that a large number of grievances may put defendants on

2  notice such that the claim should survive summary judgment on a claim of deliberate

3  indifference (in a case involving a claim of racial harassment against a guard)).  Opp., p. 15.

4  Plaintiff also cites in his opposition (id.) Delaney v. DeTella, 256 F.3d 679, 686 (7th Cir. 2001)

5  (subjective element of Eighth Amendment claim satisfied where plaintiff alleges defendants did

6  nothing after "repeated requests" to defendants "and "their knowledge of the potential risk."); see

7  also, Coleman v. Wilson, 912 F. Supp. 1282, 1316 (E.D. Cal. 1995)[6]:

> The question of whether a defendant charged with violating rights
> protected by the Eighth Amendment has the requisite knowledge is
> "a question of fact subject to demonstration in the usual ways,
> including inference from circumstantial evidence [citation
> omitted], and a factfinder may conclude that a prison official knew
> of a substantial risk from the very fact that the risk was obvious."
> Id. at 511 U.S. 825, ----, 114 S.Ct. at 1981.[7] The inference of
> knowledge from an obvious risk has been described by the
> Supreme Court as a rebuttable presumption, and thus prison
> officials bear the burden of proving ignorance of an obvious risk.
> Id. at ----, 114 S.Ct. at 1982.  It is also established that defendants
> cannot escape liability by virtue of their having turned a blind eye
> to facts or inferences "strongly suspected to be true." Id. at ---- n. 8,
> 114 S.Ct. at 1982 n. 8, and that "[i]f ... the evidence before the
> district court establishes that an inmate faces an objectively
> intolerable risk of serious injury, the defendants could not plausibly
> persist in claiming lack of awareness." Id. at ---- n. 9, 114 S.Ct. at
> 1984 n. 9.

18        The court must proceed to address the claims and evidence of the parties as to

19  each defendant to resolve the present motion.

20        *Disputed Facts*

21        Primary among the facts in dispute is whether or not plaintiff suffered food

22  poisoning as a direct result of the food preparation and/or food service conditions complained of

---

24  [6] Plaintiff appears to have borrowed language directly from a portion of the Findings and
Recommendations this court filed on June 17, 2009 (see, e.g. pp. 17-18), in the related case,
25  Jackson v. Walker, CIV-S-06-2023 WBS GGH P, in adjudicating the summary judgment motion
in that case, which were adopted by Order, filed on August 19, 2009.

26        [7] Farmer v. Brennan, supra, at 842, 114 S. Ct. at 1981.

1   in this action.  Plaintiff alleges in his verified complaint that Dr. Duc, during his examination

2   warned him about eating CSPS food, telling plaintiff that he had recently treated a high number

3   of CSPS food poisoning cases.  Complaint, p. 11.  However, this representation is belied by his

4   deposition testimony, wherein he testifies that "[t]he doctor didn't actually tell us that we had

5   food poisoning, because they was instructed not to."  Plaintiff's Deposition (Dep.), 75:19-20.

6   Plaintiff also testifies that the doctor only gave him directions on how to take his medication.

7   Plaintiff's Deposition, 81:10 - 82:4.  Dr. Duc, in his declaration, states that on May 22, 2006 [not

8   May 23, 2006, as identified by plaintiff[8]], he examined and treated plaintiff for complaints of

9   diarrhea, diagnosed plaintiff as having gastroenteritis and prescribed him the antibiotic Cipro, as

10  well as Kaopectate for diarrhea.  MSJ, Declaration of V. Duc, M.D., Doc. # 35-7, ¶ 4.  While he

11  maintains that he did not diagnose plaintiff with food poisoning and that there was no evidence to

12  conclude that plaintiff's diarrhea was caused by a foodborne illness, he states that he "suspected"

13  that plaintiff "suffered from an infection of Campylobacter, a common bacteria that causes

14  diarrhea, which was spread by an inmate" who had been recently transferred from another prison

15  to CSPS.  DUF # 38; id., ¶¶ 6-7, Ex. A.  Plaintiff does not dispute that Dr. Duc did not diagnose

16  [plaintiff] with food poisoning, and never told him that he had food poisoning (DUF # 37), but

17  without reference to any supporting evidence, does assert a caveat that Dr. Duc did not tell him at

18  that time that he did not have food poisoning and did not so state until defendants vehemently

19  denied it.   Plaintiff's response to DUF, p. 5.  Nor does plaintiff dispute that Dr. Duc suspected he

20  had an infection of Campylobacter, a common bacterial infection that causes diarrhea, which was

21  spread by an inmate who had recently transferred to CSPS from another prison.  Plaintiff's rsp. to

22  DUF, p. 5.  However, again without identifying the supporting evidence, plaintiff does maintain

23  that there is medical evidence that the symptoms he experienced are categorized as being a

24  foodborne illness.  Id.  Plaintiff avers that Campylobacter and gastroenteritis are common

25  ──────────────

26      [8] Within his deposition testimony, plaintiff concedes that the correct date may have been
        May 22.  Plaintiff's Deposition,  74:7-14.

14

1  "stains" [sic] (by which he may mean "strains") of foodborne illness.  Id.

2          Although plaintiff, as noted, failed to identify his supporting evidence for his

3  medical conclusions at the appropriate point in his response to the DUF, plaintiff apparently

4  seeks to rely on Exhs. B, C, and D to his opposition to which defendants object.  In Exhs. B, C,

5  and D to his opposition, plaintiff presents documents which are not sufficiently, as plaintiff

6  would have it, self-authenticating (see Fed. R. Evid. 902), merely because, for example, Exh. B,

7  appears to be an excerpt of a 2004 publication from the Center for Disease Control regarding the

8  "Diagnosis and Management of Foodborne Illnesses").  Opp., pp. 23-27; plaintiff's declaration,

9  p. 96.  Exh. C is simply entitled "Foodborne Illness Outbreak," which plaintiff labels as being a

10  "Response Protocol for NSW Public Health Units" and the origin of Exh. D "Foodborne

11  Bacterial Pathogens" is completely unidentified by plaintiff.  Opp, pp. 28-43.  Defendants'

12  objections to these exhibits are well-taken inasmuch as the exhibits lack foundation, are hearsay,

13  call for a medical expert opinion and lack authentication.  Reply, p. 4; citing, inter alia, Fed. R.

14  Evid. 602, 702, 802, 901.  To the extent that he avers in his brief declaration that these exhibits

15  were an alternative source of information for documents he was unable to produce due to the

16  untimeliness of his requests for production of documents, plaintiff fails thereby to have filed the

17  requisite affidavit pursuant to Fed. R. Civ. P. 56(f) to demonstrate that he could not "present facts

18  essential to justify" his opposition.  Opp., plaintiff's Declaration ¶ 3.  In addition, plaintiff's

19  effort to authenticate the documents by way of his own declaration falls short in that defendants

20  are correct that he has not verified the source of the documents nor indicated that they are true

21  and correct copies, although that alone might not render them inadmissible in light of the very

22  liberal application of the evidentiary rules in adjudicating dispositive motions, espoused by the

23  Ninth Circuit (see Thomas v. Ponder, supra, 2010 WL 2794394), with regard to a prisoner pro se

24  plaintiff.

25          However, even if the court were to consider the documents as evidence in support

26  of plaintiff's opposition, plaintiff lacks the medical expertise to link his symptoms or illness to

1    food poisoning.  Nor is he able to show that the illness he suffered was a result of a particular

2    meal he ate or that, even if he were able to do that, can he demonstrate that any claimed infection

3    from eating any such hypothetical meal arose from the conditions complained of within this

4    complaint.  It is true that within, for example, plaintiff's Exh. B, the following statement is

5    included: "Bacterial agents most often identified in patients with foodborne illness in the United

6    States are *Campylobacter*, *Salmonella*, and *Shigella* species, with substantial variation occurring

7    by geographic area and season."  Opp., p. 24.   However, as defendants argue in their reply,

8    plaintiff has no medical training (see, e.g., plaintiff's Dep. 97:3-6) and simply is not qualified to

9    interpret the articles to support his contention that he contracted a foodborne illness; nor does

10   plaintiff provide admissible evidence that the Campylobacter bacterium can only be transmitted

11   by the consumption of food as opposed to human contact or that the 2006 outbreak he references

12   in his grievance response (see below) was caused by the food inmates ate at CSPS.  Reply, p. 2.

13            Dr. Duc avers that it is his practice when examining a patient to, inter alia, inquire

14   into the patient's belief as to the source of his complaint and to write in the patient's chart

15   everything relevant the patient tells him, as well as his own impressions as to the source of the

16   complaints.  Id., ¶ 3.  Attached as Exh. A to his declaration (id., ¶ 4), is a copy of

17   "interdisciplinary progess notes," dated 5-22-06, noting, inter alia, plaintiff's diarrhea and an

18   "outbreak of Campylobacter from DVI ...."  Dr. Duc appears to state that the outbreak is

19   spreading and has a question mark after the notation "c/a C-block," which the court is unable to

20   interpret.  MSJ, Duc Dec., ¶ 4, Exh. A.  Plaintiff also has conceded that he never asked Dr. Duc

21   what Campylobacter meant or what caused his gastroenteritis.  Plaintiff's resp. to DUF # 40.

22            Nevertheless, plaintiff maintains that, along with himself, some 50-75 inmates

23   contracted food poisoning during the month of May in 2006.  Opposition (Opp.), Doc. # 44, p. 2;

24   see also plaintiff's deposition, 96: 2-4, wherein plaintiff testifies that in addition to [himself as

25   well as] Inmates Williams and Jackson, "about 50 more individuals got sick...."  He further

26   argues that it was only after this "temporary epidemic" that defendants began to slowly

implement safety measures and not until four years after plaintiff contends that the defendants became aware of the unsafe food conditions (evidently, in 2003, long before his arrival at CSPS (see below)) and only after a "vast amount" of inmates got sick, that is, not until 2007, did the defendants actually begin to implement the policies that they said were being set in place. Opp., pp. 2-3. The exhibits that plaintiff has produced that speak directly to the issue of alleged food poisoning of inmates include the following set forth. Exh. E to the verified complaint is a copy of an inmate group appeal (Log No. 06-00566), filed by an inmate named Glenn Wright on 2/10/06, claiming that he had been treated at CSPS on 2/02/06 for food poisoning from a meal served to him at the prison the day before [i.e., on 2/01/06], stating that he (Wright) had found hair in his food, that food handlers failed to wear head wear or to change gloves after handling unsanitary items. Inmate Wright states that "a number of inmates are being exposed to food poisoning...." and complains about reports of rats being found in the C-facility bakery and of inmate appeals related to the health and safety risks of food service being "obstructed, ignored, and denied." Exh. E, p. 45. In his request for a third level response, on 5/01/06, Wright references the 3/24/06 incident of rat/rodent feces and bite marks in the cake sheets in the main bakery (see below) as well as finding "ludicrous" Warden Walker's 4/18/06 second level appeal response that vector control had eliminated the rat/rodent problem (that portion of the response is not included as part of the exhibit). The group appeal appears to have been signed by more than fifty inmates. The portion of the 4/18/06 appeal response provided indicates that defendant Rodriguez had been assigned to investigate the claims at the second level.

Exh. F to the verified complaint is a copy of a 602 appeal (Log No. 06-00615) filed on 3/02/06 by Inmate Williams (plaintiff in related case, CIV-S-07-2385), claiming that he had been diagnosed with, and treated for, food poisoning on 2/17/06, after eating his dinner meal, and complaining that CSPS had had a food poisoning outbreak due to the main kitchen's rat/rodent infestation. He also claims that he has found hair and other items in his food and tray due to numerous people handling his food because he is served in his cell. The appeal responses

have not been included.  (The court notes that neither of these grievance allege a case of food poisoning in May of 2006).  As to plaintiff's grievance filed related to his own alleged food poisoning (referenced above), plaintiff produced Exhs. O and P, copies of an inmate appeal filed by plaintiff on 5/31/06, wherein he claims to have suffered serious flu-like symptoms during the week of May 17, 2006 through May 23, 2006, stating that his treatment was delayed due to a food poisoning outbreak that had exhausted the available medical treatment as explained to a correctional officer named Jeffries by an MTA Cordova (or Corona).  A portion of the second-level appeal response by Associate Warden Malfi states:

> Your claim that your illness was a result of improper food handling here at SAC is unsubstantiated.  When staff first observed the number of inmates complaining of flu-type symptoms, rumors quickly spread that it was due to food poisoning.  However, reported outbreaks were occurring throughout the Institution and not all of the inmate population was affected in any facility.  No Public Health Outbreak Memo was generated based on this incident; however, per MTA Spinks, Health Care Officials diagnosed this outbreak as being bacterial in nature, not viral, and the source of the outbreak was not determined.

Exh. O to Complaint, p. 75.

Exh. J to plaintiff's opposition is a copy of a July 13, 2006, C-facility Men's Advisory Council memorandum/minutes of meeting between inmates with, inter alia, two of the defendants, Haythorne and Hague, raising the issue of improper food preparation/service resulting in CSPS food poisoning cases.  Defendant Haythorne was noted as having said that any outbreak of food poisoning actually linked to something inmates were served would require implementation of emergency measures.

In addition to his exhibits, within his verified complaint, plaintiff alleges that on or about December 31, 2005, two inmates, Henry, CDC # P-64498, and Douglas, CDC # H-53369, had prison jobs in the main kitchen bakery in the morning hours and upon plaintiff's information and belief, both inmates began to discover dead rats/rodents.  Complaint, p. 9. Plaintiff alleges that inmate Douglas told him of the rat/rodent infestation in the main kitchen in

1    January of 2006, and that the rats/rodents had access to food stored in the dry goods room and to

2    prepared food left out overnight to cool.  Id., at 10.  Plaintiff contends that Inmate Douglas told

3    plaintiff not to eat certain prison food because of the rodents and that he, Douglas, was being

4    treated for what a doctor had advised was food poisoning as a result of food he had consumed

5    while at work in the main kitchen.  Id.

6            Plaintiff has submitted sufficient evidence to support a finding that there was an

7    outbreak of illness; however, he does not thereby demonstrate what he was actually suffering

8    from was food poisoning.  On the other hand, Dr. Duc does concede an abdominal bacterial

9    infection was indicated and he does not definitively resolve that plaintiff did not have food

10   poisoning by stating that he "suspected" Campylobacter and that the source of it was another

11   inmate transferred in from a different prison.  The problem, however, for plaintiff here, as it was

12   for the plaintiff in the related case, <u>Jackson v. Walker</u>, Case No. CIV S-06-2023 WBS GGH P, is

13   that: (1) plaintiff cannot prove that he suffered from food poisoning on one occasion; and (2)

14   even if the court may find there remains a fact dispute as to whether or not plaintiff suffered food

15   poisoning, plaintiff does not have, nor is he likely to ever be able to produce, evidence that any

16   such ostensible food poisoning was the result of the unsanitary food preparation or service he

17   seeks to implicate herein.  Plaintiff does not identify any medical expert witness on his behalf,

18   nor does he demonstrate that he can ever meet his burden to establish the requisite element of

19   causation for the infection for which he was treated; that is, he is unable to show that he suffered

20   from food poisoning; thus, he cannot show that the unsanitary food conditions/preparation/

21   handling challenged herein could have caused him to contract food poisoning.  <u>Harper v. City of</u>

22   <u>Los Angeles</u>, 533 F.3d 1010, 1026 (9th Cir. 2008)(plaintiff must demonstrate defendant's conduct

23   was the actionable cause of the claimed injury); <u>Arnold v. International Business Machines</u>

24   <u>Corp.</u>, 637 F.2d 1350, 1355 (1981)(plaintiff must show that defendants caused his injury).

25            *Defendant Arndt*

26            As to defendant Arndt, plaintiff alleges he is a "supervising cook II at CSPS

19

responsible for ensuring the health and safety standards of food preparation and service at

CSPS," and that he acted with deliberate indifference to the health and safety of inmates

inflicting cruel and unusual punishment with respect to the policies, practices and procedures

challenged by the plaintiff.  Complaint, p. 6.  He contends that this defendant, as well as all the

others, has been made aware of, and has had personal knowledge of unsanitary food conditions

and food handling since as early as January 9, 2003, but has done little to enforce health and

safety standards.  Id., at 7.  Plaintiff contends that, inter alia, defendant Arndt supervised the

CSPS main kitchen and was aware of rats/rodents nesting and mating in the main kitchen for

years before plaintiff's arrival and that the only method used to address the situation has been to

place "stick[y] traps" throughout the main kitchen, hoping thereby to trap/control the spread of

rats/rodents while continuing to permit food for the prison to be stored and prepared there.  Id.

Plaintiff claims that defendant Arndt, along with the others knew of dozens of inmate complaints

about the refusal of correctional officials to adhere to appropriate health and safety standards in

the service and handling of food.  Id., at 7-8.  By way of example, plaintiff alleges that prison

officials assigned to serve food to inmates in their cells would often throw bread racks for the

transport of food trays on the floor when emptied and then take them back to the housing unit

kitchens [i.e., satellite kitchens].  Id., at 8.  However, as to this allegation and any other allegation

against defendant Arndt regarding food preparation, service, handling or any other condition in

the satellite kitchens, defendant Arndt is entitled to summary judgment as to any claim arising

from conditions in the satellite conditions because plaintiff does not materially dispute that this

defendant did not inspect the satellite kitchens, never worked in the satellite kitchens and never

saw the cell feeding process, although he contends, vaguely and without citing supporting

evidence, that "defendant Arndt still had knowledge of the feeding process."  See DUF no. 25

above, and the undisputed fact # 26, included here, that defendant Arndt never worked in the

satellite kitchens and never saw the cell feeding process.  MSJ, Declaration of M. Arndt, ¶ 2;

plaintiff's response to DUF, p. 4.  Therefore, plaintiff's allegations as to this defendant at this

point necessarily must center on the alleged rodent infestation and food contamination in the

main kitchen and the alleged inadequate response to inmate complaints about that.

Defendant Arndt states that he was employed from October 2002 to October 2008

as a supervising correctional cook at CSPS.  MSJ, Declaration of Defendant M. Arndt,  ¶ 1.

Defendant Arndt states that his duties included "planning, organizing, and supervising the

preparation, cooking, distribution, and serving of food to inmates..." both at CSPS and other

CDCR[9] institutions located in the vicinity; training and instructing employees and inmates;

supervision and maintenance of food service equipment, supplies and work areas; reviewing and

responding to inmate appeals.  Id.  Although informed that at least one inmate at CSPS had filed

a grievance complaining about the food service, rodents in the main kitchen and contracting food

poisoning at CSPS, defendant Arndt does not believe he ever reviewed or responded to any such

grievance.  Id., at ¶ 3.  Defendant Arndt declares that he never saw a rodent infestation in the

main kitchen at CSPS.  Id., at ¶ 4.  He further maintains that whenever he was informed by a

supervising correctional cook or an inmate about seeing a rodent or evidence of rodent activity,

defendant Arndt would immediately contact vector control, who would lay traps in the main

kitchen's affected areas.  Id., at ¶ 5.  He avers that no staff ever told him an inmate had gotten

food poisoning or that there was an outbreak of food poisoning at CSPS, and he never fed, or saw

anyone feed, contaminated food or food suspected of being contaminated, either by rodents or

spoilage, to the CSPS prison population.  Id., at ¶¶ 6-7.

The basis for plaintiff's allegation that the defendants have known of unsanitary

food preparation/conditions/handling since January 9, 2003 (before plaintiff's transfer to CSPS in

October, 2005), appears to be a memorandum of the same date.  Plaintiff's Exh. A to the

complaint, as well as to his opposition, is a copy of a January 9, 2003, CSPS memorandum

regarding "food trays," apparently authored by Warden Pliler (although signed by "T. Rosario"),

_____

[9] California Department of Corrections and Rehabilitation.

21

1  which references "numerous inmate complaints regarding cell feeding." Staff is therein directed

2  not to place more than three food trays on the carrying racks, not to stack or overlap food trays

3  and to "make certain that food is handled and prepared in a safe and sanitary manner." Any

4  questions regarding procedures are to be directed to C. Hague (defendant herein). As plaintiff

5  does not dispute that defendant Arndt had never worked in the satellite kitchens or saw the cell-

6  feeding process (although, as noted earlier, plaintiff somewhat ambiguously claims Arndt

7  nevertheless "had knowledge of the feeding process"), plaintiff fails to demonstrate how this

8  defendant could have been responsible for those conditions or could have ameliorated them.

9          With respect to defendant Arndt's alleged responsibility for ignoring inmate

10  complaints, within his complaint plaintiff does not mention this defendant in that portion wherein

11  plaintiff asserts administrative exhaustion as to his allegations, which militates for a finding that

12  this defendant was not directly involved in the processing of the inmate grievances at issue, as

13  this defendant has maintained. Plaintiff does not cite a single instance of this defendant ever

14  having reviewed an inmate grievance regarding inmate complaints about rats/rodents in the main

15  kitchen or food contamination. Nevertheless, as this court noted in the related Case No. CIV-S-

16  06-2023, protestations by this and other defendants (see below) that they never saw evidence of

17  rodent activity during this period while rodents concededly existed throughout the institutional

18  premises (DUF # 5) is a questionable assertion, particularly in a defendant such as Arndt, who, in

19  the course of fulfilling his job's responsibilities, would be presumed to have conducted

20  inspections of the main kitchen. Whether or not he did see such evidence himself, this defendant

21  does not question whether there were rodents present in the main kitchen and plaintiff has

22  presented sufficient evidence to show that rats contaminated cakes left exposed overnight in the

23  main kitchen. The difficulty for this plaintiff, as it was for plaintiff Jackson, however, is that he

24  cannot adequately support his claim that this defendant did not call vector control when rodent

25  activity in the main kitchen was presented to him, that the failure to do more than that rose to the

26  level of an Eighth Amendment violation, even in light of dramatic instance of food

1  contamination that he presents.  Summary judgment should be granted to this defendant.

2  _Defendant Rodriguez_

3  Plaintiff alleges that defendant Rodriguez is a supervising cook II at CSPS,

4  responsible for ensuring that the health and safety standards of food preparation at CSPS are met,

5  but who acted with deliberate indifference to plaintiff's health and safety, inflicting cruel and

6  unusual punishment by the policies, practices and procedures plaintiff challenges herein.

7  Complaint, pp. 5-6.   As with the other defendants, plaintiff maintains that defendant Rodriguez

8  knew since January of 2003, years before plaintiff arrived, of the nesting and mating problem

9  with the rodents in the main kitchen, only addressing the problem with sticky traps; he is also

10  alleged to have been aware of dozens of inmate complaints about correctional officials' refusal to

11  adhere to health and safety standards in food service and handling.  Complaint, pp. 7-8.  Plaintiff

12  contends that the defendants, including Rodriguez, knew about how bread racks used for the

13  transport of food trays were thrown on the floor after they were emptied, that the food cart was

14  used as a cart for sheet exchange and to transport other supplies during non food service hours

15  without either the racks or cart being cleaned before being used during food service.  Id., at 8.

16  Rodriguez and the other defendants knew that the bread racks were stacked more than three high

17  to expedite food service to inmates.  Id.

18  Exh. E to the verified complaint , the inmate group appeal (Log No. 06-00566),

19  noted above, wherein inmates signed on to the grievance complaining that prison officials were

20  ignoring/obstructing inmate complaintis about food handlers failing to wear head wear or to

21  change gloves after handling unsanitary items, exposure of inmates to food poisoning,

22  complaints about rats being found in the C-facility bakery, indicated that defendant Rodriguez

23  had been assigned to investigate the claims at the second level.

24  Defendant Rodriguez confirms that he has been a supervising cook II at CSPS

25  since January of 2006 and states that his responsibilities include planning, organizing, and

26  supervising the preparation, cooking, distribution and serving of food to inmates at CSPS and

other CDCR institutions within the vicinity; assigning work to and training employees and

inmates; supervising the maintenance of food services equipment, supplies and work areas; and

reviewing and responding to inmate appeals.  MSJ, Declaration of R. Rodriguez, Doc. 35-4, ¶ 1.

Without identifying it specifically, defendant Rodriguez states that he was assigned to investigate

at least one inmate appeal claiming that the inmate had contracted food poisoning, that dirty trays

were used for serving food, that inmate workers were not properly attired and that the main

kitchen was infested with rodents.  Id., at ¶ 2.  According to defendant Rodriguez, his

investigation revealed that rodents were present in the main kitchen and throughout the entire

prison, but that the other complaints were unsubstantiated.  Id., at ¶ 3-5.  Although he  declares

that he is only assigned to the main kitchen, and has never worked in the satellite kitchens, in the

course of his investigation he observed the satellite kitchens and cell feeding process, the trays

and racks were clean and the inmates were wearing the requisite gloves and hairnets.  Id., at ¶¶

3, 9.  When he spoke with Dr. Duc and possibly Dr. Kelly about reported cases of food

poisoning, they denied there were any cases or that there was an outbreak of food poisoning.[10]

Id., at ¶ 4.

Upon discovering that rodents were present in the main kitchen and the prison,

defendant Rodriquez states that he spoke with vector control, learned that the rodents were

entering prison buildings for shelter from heavy rains, and found that vector control were laying

traps in the main kitchen as a corrective measure.  MSJ, Rodriguez Dec., ¶ 5.  As all the other

defendants aver, Rodriguez avers that he never fed, or saw anyone feed, contaminated food or

food suspected of being contaminated, either by rodents or spoilage, to the CSPS prison

population, and when he was informed by correctional or kitchen staff of a rodent or evidence of

rodent activity, he immediately contacted vector control.  Id., at 6-7.  Plaintiff attempts to dispute

the averment that this or any defendant never fed anyone contaminated food or food suspected of

---

[10] It is unclear how this defendant cannot be sure he spoke with Dr. Kelly, but at the same time, be sure that he/she denied there were any cases of food poisoning.

contamination, stating that since the source of the outbreak was undetermined, defendants had no way to test the food to determine contamination and no evidence has been presented showing that defendants tested food even after they were informed about suspected contamination.  Plaintiff's resp. to DUF # 9.  Plaintiff, once again, cites no supporting evidence in his response to the DUF for this assertion but although defendant Rodriguez does not reference this specific incident, Exh. G to the verified complaint is a copy of a 3/31/06 declaration (duplicated as Exh. L to the Opp.) sworn to by J. Cronjager, who is identified as a CSPS "free staff cook... in charge of inmate supervision in the ...C-facility main kitchen/bakery," attesting to his or her observation on 3/24/06 of what Cronjager believed to be rat/rodent feces and bite marks in 8 to 12 sheet pans of iced cake left out the day before for cooling, attesting as well to having had each contaminated cake sheet disposed of and to having notified defendant Rodriguez of the incident on the day it occurred.  Complaint, Exh. G, p. 55.  On the other hand, plaintiff admits that he has no evidence to dispute defendant Rodriguez's declaration (at ¶ 6) that CSPS has a policy of discarding an entire food item suspected of being contaminated either by rodents or spoilage, such that if a large sack of flour or sugar appears to have been gnawed at by rodents, the entire sack is disposed of.  DUF # 10; plaintiff's resp. to DUF, p. 2.

Exh. G to plaintiff's opposition is a copy of a declaration, apparently signed by a CSPS supervising cook I, named D.S. Abellon, evidently prepared for Inmate Williams' related complaint,[11] supporting the claim of an infestation of rats/rodents in the main kitchen and swearing under penalty of perjury that he/she has personally witnessed rats/rodents at CSPS at various times and that based on his own training that it would take a complete fumigation of the

_____

[11] Actually, the case identified in the Abellon Dec., implicating the same issues as the one that Williams proceeds on in the related Case No. 07-2385, was then pursued by defendant Williams in Case No. CIV-06-1373, a case which was dismissed for failure to exhaust administrative remedies on September 26, 2007 and of which the court takes judicial notice. (Judicial notice may be taken of court records.  Valerio v. Boise Cascade Corp., 80 F.R.D. 626, 635 n.1 (N.D. Cal. 1978), aff'd, 645 F.2d 699 (9th Cir.), cert. denied, 454 U.S. 1126 (1981)).

main kitchen to eliminate the infestation.   Defendants object to this exhibit on the ground that it lacks foundation.  While these objections have some merit, objections to evidence that could be made admissible at trial may be considered on summary judgment.  See Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003) (evidence which could be made admissible at trial may be considered on summary judgment); see also Aholelei v. Hawaii Dept.of Public Safety, 220 Fed. Appx. 670 (9th Cir. 2007).  This is one of those pieces of evidence that could possibly be made admissible at trial by the testimony of D.S.Abellon, but defendants make a point when they contend that the declaration does not establish how this individual has the knowledge and experience to determine whether a kitchen can be fumigated.  Even if the court were to credit this individual's assessment, plaintiff does not raise a material issue of fact with regard to defendant Rodriguez inasmuch as he does not show that this defendant was aware of food poisoning that was the result of unsanitary food preparation, particularly since he declares that this defendant avers he was informed by one or more physicians that there was no such reported case.  Nor does such evidence as he produces show that this defendant was ever responsible for serving contaminated food or for ignoring conditions that resulted in any such alleged contamination, for failing to adhere to food and safety standards rising to the level of an Eighth Amendment violation.  This defendant should be granted summary judgment.

<u>Defendant Ruller</u>

Plaintiff alleges that defendant Ruller is a supervising cook II at CSPS, responsible for ensuring that the health and safety standards of food preparation at CSPS are met, but who acted with deliberate indifference to plaintiff's health and safety, subjecting plaintiff to cruel and unusual punishment by the policies, practices and procedures plaintiff challenges herein.  Complaint, p. 6.  Defendant Ruller describes himself as having been a CSPS supervising correctional cook II at CSPS since July of 2004.  MSJ, Declaration of B. Ruller, Doc. # 35-3, ¶ 1. This defendant identifies his duties as essentially the same, if not identical, to those identified by the preceding defendants, Arndt and Rodriguez.  Id.  Defendant Ruller states that when "a couple

of inmates" filed complaints about the food service, the presence of rodents in the main kitchen and about contracting food poison, this defendant declares that after contacting the medical department about one grievance about having gotten food poisoning and speaking with other staff about the claims, they were not substantiated.  Ruller Dec., ¶ 2.  Defendant Ruller declares that he conducts main kitchen inspections and has not seen rodents, that when a rodent or evidence of a rodent is reported to him by a kitchen worker or supervising cook, this defendant contacts vector control immediately, after which traps are laid.  Id., at ¶¶ 3-4.  Like the other defendants, defendant Ruller maintains that he has never fed or seen anyone feed inmates food that was contaminated or suspected of being so and that she/he has never been informed by any staff of any inmate who had gotten food poisoning or an outbreak of food poisoning.  Id., at ¶¶ 5-6.  During occasional inspections of the satellite kitchens, this defendant states he has never seen a violation, such as stacking of bread racks, kitchen workers improperly attired, use of dirty carts or bread racks or bread racks thrown on the floor.  Id., at ¶ 7.  Plaintiff does not produce any exhibit or other evidence, other than alleging that this individual is one of those who had the responsibility to ameliorate the alleged (and conceded) conditions in the main kitchen and the conditions alleged in the satellite conditions.  As to this defendant, the following exchange occurred at plaintiff's deposition.

> Q.  What more other than bringing up the so-called rodent problem with his supervisor, being Hague and Haythorne, do you claim he should have done?
>
> A.  I can't answer that.

Plaintiff's Dep.: 130:17-20.

Nor does plaintiff's opposition or exhibits thereto provide sufficient evidence that this defendant's actions have been such to rise to the level of a violation of plaintiff's Eighth Amendment rights.  Summary judgment should be granted to this defendant.

Defendants Haythorne and Hague

Plaintiff alleges that defendant Haythorne is the CSPS Business Services

27

1  Manager, responsible for ensuring that the health and safety standards of food preparation at

2  CSPS are met, but who acted with deliberate indifference to plaintiff's health and safety,

3  subjecting plaintiff to cruel and unusual punishment by the policies, practices and procedures

4  plaintiff challenges herein.  Complaint, p. 5.  Defendant Haythorne clarifies that, since April

5  1994, he has worked for CDCR as the Correctional Food Manager at California State Prison

6  Sacramento (CSPS), with the responsibility of ensuring proper food preparation and handling in

7  the CSPS kitchens.  MSJ, Declaration of W. Haythorne, Doc. # 35-5, ¶ 1.  His duties, he

8  declares, include "maintaining proper sanitation levels, monitoring the quality and quantity of

9  production, ensuring proper food handling and storage, and implementing policies and staff

10 training" as well as reviewing and responding to inmate appeals.  Id.  This defendant states that

11 he was aware that "a couple of inmates" in 2005 or 2006 had filed grievances complaining about

12 unsanitary food service, presence of rodents in the main kitchen, and contracting food poisoning.

13 Id., at 3.  He also maintains that inmate complaints of food poisoning were unsubstantiated by the

14 medical department.  Id.

15        Plaintiff alleges that defendant Hague is the CSPS Assistant Food Manager,

16 responsible for ensuring that the health and safety standards of food preparation at CSPS are met,

17 but who acted with deliberate indifference to plaintiff's health and safety, subjecting plaintiff to

18 cruel and unusual punishment by the policies, practices and procedures plaintiff challenges

19 herein.  Complaint, p. 5.  Defendant Hague attests that she has been employed by CDCR as

20 Assistant Correctional Food Manager at CSPS since April of 2006; before that she had been a

21 supervising correctional cook II at CSPS since January of 2005.  Declaration of C. Hague, ¶ 1.

22 Her responsibilities include assisting the Correctional Food Manager [defendant Haythorne] "in

23 planning, directing, and coordinating all related food service activities," including preparing

24 food, supplying orders, planning menus, taking inventories, and conducting inspections of the

25 kitchens. Id.  In addition, she provides training and instruction to correctional staff and

26 sometimes must review and respond to inmate appeals.  Id.  Like the other defendants she was

1   aware that "a couple of inmates" had filed grievances about CSPS food service, rodents in the

2   main kitchen and food poisoning in 2005 or 2006.  Id., at ¶ 4.  Like the other defendants she was

3   aware that "a couple of inmates" had filed grievances about CSPS food service, rodents in the

4   main kitchen and food poisoning in 2005 or 2006.  Id., at ¶ 4.  Also like other defendants, she

5   maintains that she was never told of any inmate food poisoning case or outbreak by staff in 2006

6   and did not ignore any such complaints by inmates.  Id., at ¶¶ 6-8

7           It is undisputed that the procedure [for a case of food poisoning] requires

8   informing the Health Care Manager and the Correctional Food Manager, who is required to set

9   aside a sample tray of food ("deadman tray") from each pantry kitchen.  Each tray is covered with

10  plastic or aluminum wrap, dated, and stored for three days for cooked/served food and five days

11  for cooked/chilled food.  Also undisputed is the assertion that if medical staff determines that

12  testing is needed, the trays are placed in sterile containers and sent to an outside testing site for

13  analysis and that neither [defendants] Haythorne nor Hague have ever had to implement this

14  procedure at CSPS.   See MSJ, DUF # 48-#50, Doc. # 35-2, pp. 6-7.  Plaintiff does not dispute

15  the veracity of this statement of the procedures to be applied during a food poisoning episode, but

16  states that if staff does not believe such steps are needed no deadman trays are set aside and thus

17  cannot not be tested by which he no doubt means to imply that this does not show that food

18  poisoning could not be covered up by staff simply choosing not to identify it as such.  Plaintiff's

19  resp. to DUF, p. 6

20          After recounting the health and safety protocols in place to address a case of food

21  poisoning, which includes defendant Haythorne's informing the Health Care Manager, and in his

22  capacity as Correctional Food Manager, setting aside a tray of food from each panty kitchen for

23  several days, and if medical staff determines the need for testing the samples, placed in sterile

24  containers, are sent to an outside site for testing, defendant Haythorne avows that he never had to

25  implement this procedure at CSPS, that he was never informed by staff, including medical, of

26  any case of inmate food poisoning or an outbreak of food poisoning, nor did he instruct staff to

1  ignore any complaints of inmates about food poisoning at CSPS.  Haythorne Dec., at ¶ 4.

2  Defendant Hague confirms the procedure to be implemented should food poisoning have been

3  confirmed which she never had to implement and asserts that rodents were coming into the main

4  kitchen and other prison buildings in the winter of 2005 to 2006 due to heavy rainfall.  Id., at ¶¶

5  7, 9.

6        The following facts, relevant primarily to defendant Haythorne, in his correctional

7  food manager capacity, are also undisputed: DUF # 15:  In May 2006, CSPS received a batch of

8  contaminated milk from Deuel Vocational Institution (DVI).  DUF # 16: Officials at the Prison

9  Industrial Authority informed [defendant] Haythorne that a recall was issued on DVI milk.  DUF

10  # 17: [Defendant] Haythorne immediately called the warehouse, where dairy products are stored

11  at CSPS, to check if they had milk matching the recall identification numbers.  DUF # 18:  The

12  batches of milk were identified, set aside, and returned to the supplier; none of the recalled milk

13  was ever distributed to the inmate population.  Defendant Haythorne avers that the medical

14  department never notified him that there was an outbreak of illness caused by the contaminated

15  milk.  Haythorne Dec., at ¶ 7-8.

16        As to both defendants Haythorne and Hague, the following is not in dispute:

17  DUF # 28:  The bread racks used in 2005 to 2006 were not as deep as the racks used

18  subsequently, and [defendants] Haythorne and Hague had concerns about the food trays coming

19  in contact with the bottom of the rack if stacked.  Plaintiff's caveat to this is only that he

20  disagrees with any implication that new racks are being used for carrying food trays.  Plaintiff's

21  resp. to DUF, p. 4.   DUF # 29: [Defendant] Haythorne ordered the purchase of food tray covers,

22  and by 2007, the number of food trays had doubled at CSPS and the extra trays were used as

23  covers.  Plaintiff does not dispute this but says it took four years (although it must be noted that

24  plaintiff had only been at CSPS since late 2005).  Plaintiff's resp. to DUF, p. 4.  DUF # 30:  In

25  2005 and 2006, when informed by either staff or inmates that the racks were being stacked,

26  [defendants] Haythorne and Hague would contact the dining room officer so the matter could be

immediately addressed and corrected.  Again, plaintiff does not dispute this but merely asserts that defendants have acknowledged that they had no doubts that once they had left the kitchen, officers would go back to instructing inmate workers to continue stacking the racks.  Plaintiff's resp. to DUF, p. 4.  Although he does not identify it as supporting evidence, plaintiff is likely to be seeking to rely on Exh. J to his opposition, noted above, the copy of a July 13, 2006, C-facility Men's Advisory Council memorandum/minutes of meeting between inmates with, inter alia, two of the defendants, Haythorne and Hague.  Within those minutes, it is noted, inter alia, under the heading "tray stacking," that "Ms. C. Hague...readily admitted to having actually seen trays 'stacked' herself; she informed us and the Captain that as soon as she left, they would go back to stacking the trays again.  That was no revelation to us, but the Captain was visibly upset and, to her credit, made it her business to inform staff of her expectations with regard to food service/preparation."  Opp., Exh. J, p. 87.  Defendants object to the admissibility of this exhibit as lacking foundation and authentication as well as being hearsay.  While these objections have some merit, objections to evidence that could be made admissible at trial may be considered on summary judgment.  See Fraser v. Goodale, supra, 342 F.3d at 1036 (evidence which could be made admissible at trial may be considered on summary judgment).  It is difficult to perceive precisely the context wherein the minutes could be made admissible as an exhibit, but it is possible that they could be authenticated by the individual who took them at trial.  This exhibit, to the extent it could be admissible, tends to belie defendant Hague's representation that during her periodic inspections of the satellite kitchens, she never saw workers stacking food trays or bread racks.  Hague Dec. ¶ 14.  On the other hand, plaintiff expressly identified no evidence to dispute DUF # 25 above that those defendants who inspected the various satellite kitchens on occasion did not, in 2005 and 2006, see, inter alia, the stacking of food trays or bread racks, use of dirty carts or bread racks, or bread racks thrown on the floor.  This would appear to include defendant Hague and plaintiff's only response to this fact set forth as undisputed by plaintiff is that he lacks knowledge or information to dispute it "because the plaintiff production of

document motion was rendered untimely."  Plaintiff's resp. to DUF, p. 4.  The court has

previously noted that plaintiff has not filed the requisite affidavit pursuant to Fed. R. Civ. P. 56(f)

to demonstrate that he could not "present facts essential to justify" his opposition, thus this kind

of vague claim has no bearing on the adjudication of this motion.  Exh. B and part of Exh. D to

the verified complaint are copies of an inmate appeal (Log No. 05-01211) evidently submitted on

7/04/05 by Inmate Jackson (plaintiff in the related Case No. CIV-S-06-2023), complaining that

food servers in C-facility were not wearing gloves or hats, that food trays were being carried on

dirty bread racks which racks were stacked three high, allowing dirt to fall into the lower food

trays, that food was not properly heated, was mixed improperly, bruised or damaged.   When the

appeal was partially granted at the first level, Inmate Jackson withdrew it.  Within his complaint,

plaintiff cites the response to this appeal as verifying that inmates not medically cleared to handle

food were being authorized by correctional officials to do so.  Under "summary of investigation"

in the first level appeal response, the following relevant portion of a first level appeal response

signed by Sergeant D. Guillory appears to substantiate or at a minimum raise questions as to that

allegation:

> In the interview with Officer McFayden, he said that, at times, he
> did use the tier tenders in the block to run trays up on the tiers.  I
> did inform him that was not acceptable, per CCR, Title 15, Section
> 3052(e), which states, in part, "No person shall be assigned to
> handle food until instructed on the standards for sanitation as set
> forth in Health and Safety Code (H&SC) Sections 27605, 27623,
> and 28291..." and CCR, Title 15, Section 3052(g), which states, in
> part "No inmate shall be assigned to the food service . . . until
> medically cleared to handle food," as they were not Food Handler
> cleared.  He understood and said it would be corrected.  Officer
> Jefferies stated that he did not use the tier tenders except for clean
> up after the meal.  Both Officers McFayden and Jeffries were
> instructed to pass the information along to the AM staff in their
> blocks.

Complaint, Exh. B, p. 27.

In Exh. C to the complaint, plaintiff includes a copy of a  handwritten note signed

by a Sgt. Goldman, dated 8/31/05, described as indicating that measures were being taken correct

food service problems.  This appeal, of itself, does not demonstrate defendants' knowledge of the alleged conditions; however, plaintiff includes other exhibits, which the court will set forth herein.  Part of Complaint, Exh. D, that is not a duplicate of Exh. B, is a copy of another grievance filed by inmate Jackson filed on 11/30/05 (apparently, Log No. 05-02205), regarding the stacking of bread racks as many as five high, the throwing of racks on the floor where bird feces and other bacteria adhere to the bottoms of the racks, which are re-used to supply food trays without being cleaned.  Warden Walker signed the second level partially granted appeal response, wherein it appears that plaintiff took issue with the first level appeal response that staff were washing the bread racks to avoid food contamination. Ech. D to Complaint, p. 37. The second level appeal response (subsequently exhausted at the third level), referenced the Jan. 9, 2003, memo regarding not stacking food trays, and appears to have expanded or clarified it as follows:

> The memorandum outlining the policy regarding food trays dated January 9, 2003, will be adhered to by staff in all housing units regarding the stacking of food trays.  The bread racks utilized to carry food trays will not be stacked on top of each other to assure that contamination of the food items will not take place.

Exh. D to Complaint, p. 36.

DUF # 32: [Defendant] Haythorne also established a policy requiring that all correctional officers receive pantry training to ensure that replacement officers, in the absence of the regularly assigned officer, were familiar with proper food service and to avoid any lapses with standard procedures.  DUF # 33: [Defendants] Haythorne and Hague were not involved in the process of medically clearing inmates to handle food or to work in food service at CSPS. Nor were they involved in choosing volunteer workers to assist with cell feeding during modified programs or when needed.

The problem plaintiff faces with respect to these defendants is not in posing disputed facts about sanitary practices, but in linking the alleged, sporadic unsanitary conditions to any actual injury he suffered.  Plaintiff speculates that his one time food poisoning, caused in

1  his opinion by the unsanitary practices, was in fact food poisoning as opposed to the myriad of

2  other unrelated conditions or diseases which might cause similar symptoms, or indeed was food

3  poisoning caused by defendants' actions as opposed to otherwise undiscoverable conditions

4  leading to food poisoning.  He would of necessity have to ask the jury to speculate as well

5  concerning causation, and this he cannot do.  "The verdict of a jury cannot rest on guess or

6  speculation."  Neely v. St. Paul Fire & Marine Ins. Co., 584 F.2d 341, 346 (9th Cir. 1978).

7  Causation in a § 1983 action must be actually and proximately demonstrated.  Harper v. City of

8  Los Angeles, 533 F.3d 1010, 1026 (9th Cir. 2008); White v. Roper, 901 F.2d 1501, 1505 (9th

9  Cir. 1990).  The situation here is similar in principle to the evidence case of General Elec. v.

10  Joiner, 522 U.S. 136, 143-145, 118 S.Ct. 512, 518 (1997).  In this case, the Supreme Court

11  upheld the exclusion of evidence that defendant's PCBs had caused plaintiff's cancer based on

12  the unreliable extrapolation, i.e., speculation, based on remote animal studies.  As a result,

13  causation was lacking.  Here, plaintiff does not even have an expert to posit a speculative basis;

14  rather he expects to avoid summary judgment on his layperson's *ipse dixit* alone.  If this case

15  went to trial, a granting of defendants' Rule 50 motion would be a foregone conclusion.  Because

16  there is no possible way plaintiff could prove an element of his case – actual causation –

17  summary judgment is proper.[12]

18          The court notes that in the related case, in an opposition that was more

19  exhaustively supported, Jackson v. Walker, CIV S-06-2023 WBS GGH P, summary judgment

20  was denied to this defendant in an unsanitary food conditions case.  However, the factual

21  showing necessary for causation, albeit barely present in Jackson, was sufficient to avoid

22  summary judgment.  In addition, Jackson was a case which involved injunctive relief, a claim for

23  which no actual injury need be shown – imminent,  foreseeable  injury would be sufficient.  The

24

25          [12] In a situation where a plaintiff suffered repeated episodes of sickness contemporaneous
       with ingestion of food, an inference could be drawn as to what was causing the sickness.
26     However, the one-time allegation here does not permit the drawing of any reasonable inference.

present case does not have a cognizable injunctive relief claim.

As to defendant Hague, plaintiff's exhibits show inmates claim to have contracted food poisoning as a result of food prep and service in the CSPS main and satellite kitchens, but again plaintiff has the difficult causation hurdle that he does not adequately address.  Hearsay claims by other inmates as to what medical condition applied to them is simply an inadmissible fact in the context of plaintiff's allegations.  Their hearsay speculation is not any better than plaintiff's.  Summary judgment should be awarded this defendant as well on the causation issue.

*Qualified Immunity*

Defendants argue that they are entitled to qualified immunity.  Based on the foregoing, the court need not reach that issue.

Accordingly, IT IS HEREBY RECOMMENDED that:

1.  Defendants' motion for summary judgment, filed on November 11, 2009 (docket # 35), be GRANTED as to defendants Arndt, Ruller, Rodriguez, Haythorne and Hague;

2.  Plaintiff's claims for injunctive relief be dismissed as moot in light of his prison transfer; and

3.  This case be closed as there are no remaining defendants.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  The parties are

\\\\\
\\\\\
\\\\\
\\\\\

1   advised that failure to file objections within the specified time may waive the right to appeal the

2   District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

3   DATED: August 11, 2010

4                                                      /s/ Gregory G. Hollows

5                                                      GREGORY G. HOLLOWS
                                                       UNITED STATES MAGISTRATE JUDGE

6   GGH:009
    camp1419.msj

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26